FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2023 JUN 27 PM 3: 19

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA

CASE NO. 8:23-CR-215-CEH-MRM

vs.

STEPHEN DUVALL and
STEVEN MCDONALD

18 U.S.C. § 371

## INFORMATION

The United States Attorney charges that:

### COUNT ONE
(Conspiracy to Defraud the United States and
to Solicit and Receive Health Care Kickbacks)

### Introduction

At all times material to this Information:

### The Defendants and the Relevant Entities

1. Company 1 was a corporation formed under the laws of Florida with a principal place of business in Pinellas County, Florida, that purported to provide home health services. Company 1 held an account at Bank A ending in x8927 (the "Company 1 Account").

2. West Coast Therapy Specialist LLC ("WCT") was a limited liability company formed under the laws of Florida with a principal place of business in Pinellas County, Florida, that purported to provide physical therapy services. WCT did business under the fictitious name Q Med Consulting. WCT held an account at

Bank B in the name of West Coast Therapy Specialist LLC DBA Q Med Consulting ending in x5692 (the "WCT/Q MED Account").

3. STEPHEN DUVALL was a physical therapist and a resident of Pinellas County, Florida. STEPHEN DUVALL operated and controlled WCT and the WCT/Q MED Account.

4. STEVEN MCDONALD was a resident of Pinellas County, Florida, who held a personal account at Bank C ending in x6570 (the "McDonald Account").

5. Individual 1 owned and operated Company 1. Individual 1 was the sole signatory on the Company 1 Account.

6. Individual 2 was Company 1's director of nursing.

### The Medicare Program

7. The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

8. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

9. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, certain

eligible home health care costs for medical services provided by a home health agency ("HHA") to persons who already qualified for Medicare and who additionally required home health services because of an illness or disability that caused them to be homebound.

11. Medicare "providers" included HHAs, physicians, and other health care providers who provided items services to beneficiaries. To bill Medicare, a provider was required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

11. A Medicare "provider number" was assigned to a provider upon approval of the provider's Medicare Enrollment Application. A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

12. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item,

or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

13. When submitting claims to Medicare for reimbursement, providers were required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services that were purportedly provided, as set forth in the claims, were medically reasonable and necessary, provided as represented, and not procured through the payment of illegal kickbacks and bribes.

14. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### Medicare Coverage for Home Health Services

15. Medicare only covered home health services, if, on the claimed dates of service:

   a. the Medicare beneficiary was under the care of a doctor and receiving services under a plan of care established and reviewed regularly by a doctor;

   b. the Medicare beneficiary needed, and a doctor certified that the

beneficiary needed, one or more of the following: (i) intermittent skilled nursing care, (ii) physical therapy, (iii) speech-language pathology services, or (iv) continued occupational therapy;

c. the HHA must have been approved by Medicare (Medicare-certified); and

d. the Medicare beneficiary was homebound, and a doctor certified that the Medicare beneficiary was homebound.

## The Conspiracy

16. From in or around June 2017, and continuing through in or around March 2020, in Pinellas County, in the Middle District of Florida, and elsewhere, the defendants,

> STEPHEN DUVALL and
> STEVEN MCDONALD,

did knowingly and willfully combine, conspire, confederate, and agreed with each other and others known and unknown to the United States, to:

a. defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS, in their administration and oversight of Medicare; and

b. violate 42 U.S.C. § 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind,

in return for referring an individual to a person for the furnishing and arranging for the furnishing of home health services for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

17. It was a purpose of the conspiracy for STEPHEN DUVALL, STEVEN MCDONALD, and their co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in exchange for recruiting and referring Medicare beneficiaries to Company 1 for purported home health services; (b) submitting and causing the submission of claims to Medicare for home health services that Company 1 purported to provide to these recruited and referred beneficiaries; (c) concealing and causing the concealment of the kickbacks and bribes; and (d) diverting proceeds of the conspiracy for their own personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means

18. The manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

   a. It was a part of the conspiracy that STEPHEN DUVALL, STEVEN MCDONALD, and others solicited and received kickbacks and bribes from Individual 1 and Individual 2, in exchange for recruiting and referring Medicare beneficiaries to Company 1 for purported home

health services.

b. It was further a part of the conspiracy that STEPHEN DUVALL, STEVEN MCDONALD, Individual 1, Individual 2, and others caused Company 1 to submit claims to Medicare for home health services purportedly provided to these recruited and referred beneficiaries.

c. It was further a part of the conspiracy that STEPHEN DUVALL, STEVEN MCDONALD, Individual 1, Individual 2, and others concealed and caused the concealment of the kickbacks and bribes through sham contracts and agreements.

d. It was further a part of the conspiracy that STEPHEN DUVALL, STEVEN MCDONALD, Individual 1, Individual 2, and others caused Medicare to make approximately $1,197,868 in payments to Company 1 based on false and fraudulent claims for home health services purportedly provided to Medicare beneficiaries recruited and referred by STEPHEN DUVALL and STEVEN MCDONALD.

### Overt Acts

19. In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Florida, at least one of the following overt acts, among others:

a. On or about October 8, 2019, STEVEN MCDONALD deposited and caused to be deposited into the McDonald Account a check, numbered

3341, in the approximate amount of $2,000, written from the Company 1 Account to Steven McDonald.

b. On or about February 7, 2020, STEPHEN DUVALL deposited and caused to be deposited into the WCT/Q MED Account a check, numbered 3536, in the approximate amount of $1,600, written from the Company 1 Account to Q Med.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

1. The allegations contained in Count One are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of a conspiracy to violate 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. The property to be forfeited as to defendant STEPHEN DUVALL includes, but is not limited to, the approximately $54,900 in proceeds obtained as a result of the commission of the offense.

4. The property to be forfeited as to defendant STEVEN MCDONALD includes, but is not limited to, the approximately $23,064 in proceeds obtained as a result of the commission of the offense.

5. If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
United States Attorney

GLENN S. LEON
Chief, Fraud Section
Criminal Division, Department of Justice

_/s/ Charles Strauss_

Reginald Cuyler Jr., Trial Attorney
Charles Strauss, Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section

_/s/_

Rachelle DesVaux Bedke
Assistant United States Attorney
Chief, Economic Crimes

9